## TWEED'S CASE.

A person having entered, January 23d, 1866, into a contract with the government to purchase, as its agent, "cotton which formerly belonged to the so-called 'Confederate States' now in the possession of individuals in the Red River country (concealed)," was not precluded by the fact of such agency and during it from buying other cotton in that region

not formerly belonging to those so-called States; he having discovered, when he went to the region, that there was no cotton upon which his contract operated, and his contract not obliging him by its terms to devote his whole time to the business of the agency, nor from buying cotton if of a kind not such as was described in his agreement.

A principal suit having been decided in one way, a proceeding by way of intervention, and involving the same question, of necessity follows it.

ERROR to the Circuit Court for the District of Louisiana; the case being thus:

The act of Congress of July 2d, 1864,* in addition to that of a prior date, " to provide for the collection of abandoned property and for the prevention of frauds in insurrectionary districts within the United States," enacted in its 8th section that it should be lawful for the Secretary of the Treasury . . . " to authorize agents to purchase for the United States any products of States declared in insurrection . . . at such prices as may be agreed on with the seller, not exceeding the market value thereof at the place of delivery," &c.

This statute being in force, Tweed, upon the 23d of January, 1866, entered into a contract with one Burbridge, then deputy general agent of the Treasury Department, in which, after reciting " that it is represented that large quantities of cotton, which formerly belonged to the late so-called Confederate States, are now in possession of individuals in the Red River country, concealed from the knowledge of agents appointed to collect the same, and the marks by which said former ownership could have been proved have been destroyed, for the purpose of enabling the individuals holding it to convert it to their own use; and whereas, it is also represented that most of this cotton is held at places and in districts remote from military posts, so that, if it could be found and identified, it could not be brought forward by the agents, except by increasing the expense of obtaining military aid in its removal, and that the parties holding it dare not bring it within the reach of the civil or military authorities, for fear that its true character may be discovered, thereby causing its seizure; and whereas, it is also repre-

---

* 12 Stat. at Large, 820.

sented that a large portion of this cotton can be purchased from the holders at much less than its real value, if the purchaser will take the title at his own risk of seizure by government authorities," it was agreed that Tweed was to furnish all money necessary to buy said cotton, together with all necessary assistance for the purpose of transportation, and to " use all proper efforts to purchase as much of said cotton situated upon and near the Red River and its tributaries as can be purchased, prepared for shipment, and transported to and delivered at New Orleans, at a cost not exceeding three-fourths its market value there, and to deliver the same to said Burbridge, in New Orleans." And, thereupon, Burbridge agreed to deliver to Tweed three-fourths of such cotton in full of his interest therein.

On the 24th of February, 1866, the Secretary of the Treasury wrote from Washington, D. C., a letter to the general agent of the Treasury Department at New Orleans, directing the termination of this contract. As hereafter stated, Tweed received notice of this revocation "in March, 1866."

Having obtained the contract above mentioned, Tweed bought from various owners, at a fair market price, in and about Shreveport, Louisiana, 495 bales of cotton; 463 bales of it were bought on or before the 1st of March, 1866 (50 of these 463 on the 5th of February preceding), and the rest upon the 5th and 8th of March.

On the 10th of March, 1866, Burbridge was succeeded in his office of deputy agent, &c., by one Flanders.

The cotton reached New Orleans March 23d, 1866, a part of it having been shipped from Shreveport on the 13th of the same month. Insurance on it was effected under an open policy of Burbridge, deputy agent, &c., and it came to New Orleans subject to *adjudication* by said Burbridge, &c.

On its arrival, Flanders, as successor of Burbridge, and the now deputy general agent of the United States, claimed one-fourth of it under the contract above stated, and accordingly delivered to Tweed the three-fourths, but refused to deliver the other fourth.

Hereupon Tweed filed a petition in the court below claim-

ing the 123 bales which Flanders, a deputy general agent, retained. The petition alleged that no part of the cotton which he had bought in and about Shreveport was captured or abandoned property, and that the United States had no right, title, or interest in the same, or any part thereof; that the 123 bales retained were worth $17,500; and that he Tweed, feared that Flanders would, pending the suit, dispose of and remove them from the jurisdiction of the court. It prayed for a citation of Flanders, sequestration of the cotton until further orders, and that, after due proceedings, the cotton be redelivered. The citation was granted and the cotton sequestered, &c.

The answer of Flanders denied that Tweed owned the cotton, and asserted that it belonged to the United States; that he, Flanders, was in possession of it as an officer of the United States, by virtue of a contract between Tweed and the Treasury Department, and that the cotton being virtually in the custody of the United States was not liable to sequestration, and that all his, Flanders's, acts in reference to it were official, and not private; that, accordingly, the court had no jurisdiction over the matters complained of, but that such jurisdiction was exclusively in the Court of Claims.

The United States, intervening, stated that the cotton belonged to *them* as sole owners, and that Flanders was in possession merely as their agent.

The case was tried before a jury. The bill of exceptions showed that evidence was offered which conduced to show—

"That the cotton was raised in the northern part of Texas, by planters, and was possessed by them until the winter of 1865–66, and was sent to market or to Jefferson, Texas, as private property, and that *it had never been captured by or surrendered to the army or any military authority of the United States, nor included in any surrender; that none of it was the property of the Confederate States, or had been destined for their use, but was private property; that the defendant testified that he had no evidence at all to affect it as captured or abandoned property;* that while said cotton was deposited in the warehouse at Jefferson, Texas,

one Turnbull, then an agent to collect abandoned and captured property, published a notice for claimants of cotton to make oath of their ownership, and failing to do this he would seize it as captured property. One of the parties whose property was seized had no notice of the order, and his property was taken and held by Turnbull, and other property was seized by said Turnbull upon protest of the same kind; and the testimony generally conduced to prove these facts, and that in the opinion of the witness *his seizures were oppressive, causeless, and for the purpose of extortion.*"

" That *in March,* 1866, the plaintiff went to Shreveport under his contract; that he discovered that there was no property of the kind described in the contract upon which it operated. He was also informed that the contract had been revoked by the Treasury Department. *The supervising agent at Shreveport first gave him information to this effect.* Thereupon he determined not to take any proceedings under it, and so notified the agent at Shreveport. During the months of February and March, he made purchases of cotton from the owners of the cotton that had been held and seized by Turnbull as aforesaid, and which was then in custody of the agents aforesaid by reason of the seizure. *He was informed that no evidence had been produced to affect the claims of the owners and the purchases were safe.* The supervising treasury agent at Shreveport, who held the cotton, so advised the plaintiff."

THE PLAINTIFF asked the court to charge:

"If the cotton described in the petition was not captured by the army of the United States, nor surrendered to them, was not abandoned property, nor was ever property of the Confederate States, but was produced on plantations of private individuals, and was held and possessed as private property by them until the purchase of the same by the plaintiff; and if he purchased the same on his own account from such private owner, and the same was delivered to him, and the same was so held until the detention of the same by the defendant, *who did not take, or hold, or possess it under color of any law or statute of the United States, or any authority of his office, or color of the same, but of his own will, the plaintiff is entitled to recover.*"

This charge the court gave, and the defendants excepted.

· THE DEFENDANT asked the court, to charge, in effect·:

" 1. That a writ of sequestration would not lie if the defendant held the cotton in question as deputy general agent of the Treasury Department, under the acts of Congress relating to captured or abandoned property.

" 2. That the Circuit Court had no jurisdiction by virtue of the writ of sequestration to direct the cotton to be taken from the possession of the defendant, if the same, at the time the writ issued, was in his possession as such agent, under color of the acts of Congress relating to captured and abandoned property.

" 3. That the defendant, if he held the possession of the cotton, as such agent for the collection of captured or abandoned property, had the right to retain the same, and that the plaintiff could not recover the property except by suit in the Court of Claims."

The court refused thus to charge; and the defendant excepted. The jury found for the plaintiff, and judgment went accordingly.

On the exceptions above stated, and on the refusal of the court on motion to arrest the judgment, the cases were now here on writs of error by both Flanders and the United States.

*Mr. S. F. Phillips, Solicitor-General, with whom was Mr G. H. Williams, Attorney-General, for the plaintiff in error:*

The case raises these questions:

1. How far one, who became an agent of the United States to purchase cotton of a certain description at a specified time and place, can show that cotton purchased by him at such a time and place is not within the scope of his agency?

2. Whether property held under the act of July 8th, 1864, section two, is liable to sequestration, *pendente lite;* in favor of an adverse claimant?

3. Whether the only remedy of the plaintiff below be not exclusively in the Court of Claims?

I. The error in the instruction requested by the plaintiff, and given by the court, is, that it takes for granted that. Tweed as agent of the United States; under the contract,

could, with regard to any cotton bought by him at the time and place that most if not all of this was, disclaim being an agent of the United States.

There was *no evidence* that Tweed's agency had been revoked by the first day of March, 1866. The letter authorizing such revocation was written at Washington on the 24th of February before, addressed to an officer at New Orleans, but Tweed first heard of it "in March," at Shreveport. The burden of showing when an existing agency terminated, is upon him who avers it, and, therefore, in this case, upon Tweed. All that he shows thereupon is that he first heard of it in March, without further specification. It may be assumed as a fact that Tweed had not heard of the revocation until several days after the 1st of March. It also appears that four hundred and sixty-three bales of this parcel of cotton were bought by Tweed on or before March 1st, and all, of it by March 8th. Much the larger part of the cotton, therefore, was bought at the time when and the place where Tweed's agency operated; probably all of it was.

Will public policy allow him to suggest that such cotton was bought as principal, for his own individual advantage?

Tweed shows that the contract extended to only such *Confederate cotton* as was on Red River, and he alleges that this was not of that class.

Before proceeding further, we observe that, if any part of this cotton, no matter how small, was purchased by Tweed as agent,—in this suit brought by him under an allegation that none of it was so purchased, the plaintiffs in error are entitled to the benefit of the doctrines in respect to the mingling and confusion by agents of their own and their principal's goods. The case shows that fifty bales were purchased on the 5th of February.

The contract was undoubtedly made at *Tweed's promotion.* This imposed upon him vigilance, activity, and the duty of having an eye single to the interest of his employer, to such extent that whilst agent he could not place himself in a position to become interested to allay or divert the suspicion of that employer as to any particular parcel of cotton. His

*bona fides* in a particular case need not be questioned. The question is whether an allowance of such liberty to an agent may not open a door to fraud in general. Will the relation of principal and agent admit of such liberty? We think not.*

II. As respects the refusal of the court to give the first and second instructions asked by the defendant, we assign as ground of error that the court assumed the propriety of the writ of sequestration issued in this case. Concede that the plaintiff was entitled to recover in some action, yet during the pendency of his action the property in question could not be taken out of the hands of an agent of the United States by sequestration; because,

1st. The custody of the cotton by Flanders was the *custody of the law*. A thing in the keeping of an officer of the government, under color of a statute of the United States, upon trust for the benefit of the whole country, is in *custody of the law*, as much as if in the keeping of an officer of the government, under color of process from a court or magistrate, upon trust for the benefit of one or more citizens.

2d. The possession by Flanders was the possession by the United States.

In the third instruction refused, the court below assumed a jurisdiction which was exclusively in the Court of Claims.

*Mr. T. D. Lincoln, contra.*

Mr. Justice CLIFFORD delivered the opinion of the court.

Cotton in bales to a large amount was purchased by the plaintiff from different owners of the same, for which he paid a fair market value, as appears by the bills of sale exhibited in the record, amounting in the whole to four hundred and ninety-five bales; [?] that he shipped the same for his own account, to his own agents in New Orleans, and that he paid the freight on the same, and the other expenses and insurance. Testimony was also introduced by the plain-

---

* See Keech *v.* Sandford, 2 Equity Cases, Abridged; Moore *v.* Moore, 1 Selden, 256.

tiff showing that the cotton was raised by planters in an adjoining State, and that they continued to possess it until it was sent to market; that the cotton had never been captured by, or surrendered to our army; that none of it was the property of the Confederate States, nor had it ever been destined for their use.

Prior to those transactions a contract had been made between a supervising special agent of the Treasury Department and the plaintiff, that the plaintiff should engage in the business of collecting captured and abandoned cotton in that district. By that instrument it was agreed between the parties that the plaintiffs should furnish all money necessary to purchase the cotton, and all the assistance required for the purpose, and all the requisite transportation, and that he should use all proper efforts to make the purchases and to transport and deliver the same to the other party, at the port of New Orleans, in good shipping order, with receipted bills of sale from the holders, at a cost not exceeding three-fourths of its market value, and free and discharged of all cost of purchase and expense of transportation. In consideration of which the other party agreed to pay and deliver to the plaintiff three-fourths of the cotton, of average quality, as compensation in full for his services, and all costs and expenses. Efforts were made by the plaintiff to make such purchases, but it appears that he soon found that there was no cotton of that description within the said district, and having learned that the contract had been revoked by the Treasury Department, he determined to proceed no further under that agreement.

Property of the kind, however, was seized by another party, to whose transactions it becomes necessary to advert, in order to a full understanding of the present controversy. He, the said other party, published a notice for the claimants of cotton to appear and make oath of their ownership, stating that if they failed to do so he would seize it as captured property. Such property was seized by that party, claiming to be an agent to collect captured and abandoned property, but the evidence introduced tended to prove that his seizures

were causeless and oppressive. Some of the cotton seized under those circumstances, and which remained in the hands of the agents of the party making the seizures, the plaintiff admits he purchased, from the owners of the same, having been previously informed by a supervising treasury agent that no evidence had been produced to affect the claims of the owners, and that it was safe to make the purchases, and it appears that the cotton was shipped to New Orleans with his other shipments. All of these transactions took place while the other party to the written agreement was a supervising special agent, but he was soon after superseded, under the instructions of the Treasury Department, and the defendant in the present suit was appointed in his place.

Enough is remarked to show the origin of the controversy, as the defendant insisted that the written agreement between his predecessor and the plaintiff was applicable to all the cotton which the plaintiff had purchased and shipped, and that he, as the successor of the other party to that agreement, was entitled to hold one-fourth of the cotton so purchased and shipped, for the United States.

Pursuant to that claim the defendant made a division of the cotton, and delivered three-fourths of the same to the plaintiff and retained one-fourth of the whole amount. Demand of the other one-fourth having been refused, the plaintiff instituted the present suit to recover the residue of the cotton, being one hundred and twenty-three bales, valued at the sum of $17,500. Service was made, and the defendant appeared and made defence.

Proceedings in the meantime took place under the last paragraph of the petition, in which the plaintiff prayed that a writ of sequestration might be issued, directed to the marshal, requiring him to take the cotton in question into his possession, and to hold the same subject to the order of the court, and he also prayed for judgment decreeing that the cotton is his property, and that the same be delivered to him, or that he have judgment for the value, with interest from judicial demand, and with privilege upon the property sequestered. Process of sequestration was accordingly issued

by the court, and it appears that it was duly served and executed by the marshal.

Exceptions to the proceeding were filed by the defendant, in which he alleged: (1.) That the cotton is captured property, and that it was at the time the writ of sequestration was issued, and that the property, as such, was in his possession and custody for the use and benefit of the United States. (2.) That the Circuit Court is without jurisdiction of the case, as the property sequestered is *de facto* and *de jure* captured property under the acts of Congress, and that it should be dealt with as the law provides.

He also filed an answer, in which he denied that the plaintiff was the owner of the property, and set up the same defence as in his preliminary exceptions. Subsequently the district attorney intervened, and alleged that the United States were the sole owners of the cotton, and prayed that their claim might be allowed and adjudged good, and that the proceedings instituted by the plaintiff may be disallowed and dismissed. Application was made by each party to bond the property, but the application of the plaintiff was granted and that of the defendant was denied.

Unsuccessful in that, the defendant next filed a peremptory exception to the right of the plaintiff to recover in the suit, in which he alleged that the plaintiff was not and never was the owner of the property; that he never owned but a two-thirds interest in the same; that the other third interest is, and throughout has been in another party. Hearing was had and the court overruled the peremptory exception and entered a decree recognizing the plaintiff as the lawful owner of the property. Whereupon the defendant sued out a writ of error and the cause was transferred to this court, where the judgment was reversed because the record did not contain any stipulation in writing waiving a trial by jury, and the cause was remanded for further proceedings.*

Pursuant to the directions of the mandate the cause came in order for further proceedings, and leave was granted to

---

\* Flanders *v.* Tweed, 9 Wallace, 425.

the defendant to amend his answer, which he did by setting up, in a more formal manner, the defences mentioned in his preliminary exception and in his former answer. Evidence was introduced by both parties, and the jury, under the instructions of the court, returned their verdict in favor of the plaintiff.

Four exceptions were taken at the trial, and the questions which those exceptions present are the only questions open in the case for re-examination. They relate to the instruction given by the court to the jury, and the three requests for instruction presented by the defendant which the court refused to give.

By the bill of exceptions it appears that the court instructed the jury, in substance and effect, as follows: That if the jury believe that the cotton was not captured by the army, nor surrendered to the national forces; that it was not abandoned property nor ever the property of the Confederate States, but that it was raised on the plantations of private individuals and that it was held and possessed by the owners as private property until the purchase of the same by the plaintiff; that the plaintiff purchased the same on his own account from such private owners, and that he held the same until it was taken by the defendant, and that the defendant did not take, hold, or possess it under color of any law or statute of the United States or any authority of his office or color of the same, but of his own will, then the plaintiff is entitled to recover.

Reasonably viewed it is clear that the instruction given covered every allegation of the claim and every ground of defence set up both in the preliminary exception and in the amended answer. Instructions given by the court at the trial are entitled to a reasonable interpretation, and if the propositions as stated are correct they are not, as a general rule, to be regarded as the subject of error on account of omissions not pointed out by the excepting party, as the party aggrieved, if he supposes the instructions given are either indefinite or not sufficiently comprehensive, is always

at liberty to ask that further and more explicit instructions
may be given, and if he does not do so he is not entitled to
claim a reversal of the judgment for any such supposed
error.* Courts are not inclined to grant a new trial merely
on account of ambiguity in the charge of the court to the
jury, where it appears that the complaining party made no
effort at the trial to have the point explained.† Where the
court charge the jury correctly upon all the ingredients of
the cause of action and upon all the matters of the defence,
it is not error in the court to refuse to instruct as requested
by either party, even though the proposition presented is
correct as an abstract proposition.‡

Beyond all doubt evidence was introduced by the plaintiff
tending to prove every proposition involved in that instruc-
tion, and it is equally clear that the evidence was of a char-
acter to warrant the finding of the jury. Suppose that is so,
still it is insisted by the defendant that the instruction is
erroneous, because it assumes that the plaintiff, notwith-
standing the written agreement to which he was a party,
could make such purchases on his own account, but the bill
of exceptions shows that there was no property to be pur-
chased of the kind specified in the written agreement, and
that the plaintiff, having ascertained that the authority of
the other party had been revoked, determined not to act
under the agreement; that the plaintiff purchased the cotton
on his own account, and paid the whole of the purchase-
money, and that none of the cotton had ever been captured
by our army or surrendered to our military authorities, and
that none of it was the property of the Confederate States
or had ever been abandoned by the owners.

Tried, as the case was, by a jury, it was certainly proper
that the court should submit the whole evidence to their
determination; and it is clear that the jury by their finding

---

* Castle v. Bullard, 23 Howard, 189; Rogers v. The Marshal, 1 Wallace,
654.

† Locke v. United States, 2 Clifford, 580; Express Co. v. Kountze, 8 Wal-
lace, 353.

‡ Mills v. Smith, 8 Wallace, 27.

have affirmed every proposition involved in the instruction in favor of the plaintiff. Such being the fact, the rule is that where the instructions given to the jury are sufficient to present the whole controversy to their consideration, and the instructions are framed in clear and unambiguous terms, it is no cause for the reversal of the judgment to show that one or more of the prayers for instruction presented by the losing party, and not given by the court, were correct in the abstract, as the refusal of the court to give the instructions as requested under those circumstances could not work any injury to the party making the request, and therefore cannot be regarded as error.* What more the defendant could properly have it is difficult to see, as the court submitted every inquiry of fact involved in the instruction to the judgment of the jury, and they, having returned their 'verdict for the plaintiff, it follows that the theory of fact assumed in the instruction is established as true, unless a new trial is granted by the court which tried the cause, or by the direction of this court for error of law. Taken together, the charge and the verdict, as perfected by the judgment, afford a presumption that the theory of fact assumed in the instruction is true, unless the contrary is stated in the bill of exceptions, or it appears that there was no sufficient evidence to warrant the court in submitting the questions to the jury.†

Three requests for instructions were made by the defendant, to the effect following:

1. That a writ of sequestration would not lie if the defendant held the cotton in question as deputy general agent of the Treasury Department, under the acts of Congress relating to captured or abandoned property.

Sufficient has already been remarked to show that there was no evidence in the case to warrant the court in submit-

---

* The Schools v. Risley, 10 Wallace, 115; Law v. Cross, 1 Black, 536; Tome v. Dubois, 6 Wallace, 555.

† Russell v. Ely, 2 Black, 580; State v. Hopkins, 5 Rhode Island, 58; Murray v. Fry, 6 Porter (Indiana), 372; Day v. Raguet, 14 Minnesota, 283.

ting such a question to the jury as an independent instruction, and the exception is accordingly overruled.*

2. That the Circuit Court had no jurisdiction by virtue of the writ of sequestration to direct the cotton to be taken from the possession of the defendant, if the jury find that the same, at the time the writ issued, was in his possession as such agent, under color of the acts of Congress relating to captured and abandoned property.

But the defendant had no right to seize the cotton in question, as the evidence showed that it had never been captured nor abandoned, and that the title to the same had become vested in the plaintiff by purchase from the private owners. Proof to show that the theory of the defence in that behalf is correct was entirely wanting. On the contrary, the defendant himself testified that he had no evidence *at all* to affect it as captured or abandoned property at the time the suit was instituted, which is certainly sufficient to show that the instruction requested was properly refused, as it is settled law that it is error in the court to give an instruction when there is no evidence in the case to support the theory of fact which it assumes.†

3. That the defendant, if he held the possession of the cotton, as such agent for the collection of captured or abandoned property, had the right to retain the same, and that the plaintiff could not recover the property except by suit in the Court of Claims.

Throughout the several propositions of the defence, the theory of fact is constantly interwoven that the defendant held the cotton under color of the acts of Congress relating to captured and abandoned property, but it is clear that a party cannot be held to have acted under color or by virtue of an act of Congress which did not confer any authority upon him, or any other person, to perform the act which is in controversy.‡ Neither an officer nor an agent can prop-

---

* United States *v.* Breitling, 20 Howard, 254.

† Id.; Goodman *v.* Simonds, Ib. 359.

‡ Reynolds *v.* Orvis, 7 Cowen, 272; Bigelow *v.* Stearns, 19 Johnson, 40; King *v.* Bedford, 6 East, 369; Britton *v.* Butler, 9 Blatchford, 462.

erly be said to have acted under color of a law which neither gave him nor any other person authority to do the act in question, nor can an officer be said to have acted under the authority of his office unless he has some appearance of right to it and is in possession and acting in that capacity, as the acts of a mere intruder or usurper of an office, without any colorable title, are undoubtedly wholly void both as to individuals and the public.* Whenever a person sued sets up a defence that he was an officer or an employé of the government acting under color of law, it plainly devolves upon him to show that the law which he invokes authorized the act in question to be done, and that he acted in good faith; but nothing of the kind is shown in this case. Instead of that he admits in his own testimony that he had no evidence at all to affect the cotton as captured or abandoned property.

Apart from that defence the theory is also constantly set up that the plaintiff during that period could not purchase cotton of the owners even though it was neither captured nor abandoned property, as he was, by virtue of that agreement, an agent of the United States, to which two answers may be made, either of which is sufficient to show that the theory is unfounded and without merit: (1.) Because the agreement does not contain any stipulation that the plaintiff should devote his whole time to the business of the agency, nor any other of a character to prohibit him from purchasing cotton from the private owners if the same was not included in the category of the cotton described in the written agreement. (2.) Because the written agreement never in fact became operative, as the plaintiff, not finding any such cotton in the district specified, never made any such purchases.

Nothing need be added in respect to the ruling of the court in denying the motion in arrest of judgment, as the motion raises the same questions as those involved in the prayers for instruction presented by the defendant and which were refused by the court.

* Plymouth v. Painter, 17 Connecticut, 593; People v. White, 24 Wendell, 525; Carleton v. People, 10 Michigan, 258; People v. Hopson, 1 Denio, 579.

Mention has already been made of the fact that the United States intervened in the suit, and the record shows that their claim was subsequently dismissed and that they also sued out a writ of error and removed the whole proceeding into this court, which is number 136 on the calendar.

All that is necessary to add upon the subject is, that the principal suit having been decided in favor of the plaintiff, the proceeding in intervention must necessarily fall with the defence set up by the defendant in that suit.

JUDGMENT IN EACH CASE AFFIRMED.

Mr. Justice BRADLEY, with whom concurred Mr. Justice DAVIS, dissenting.

I dissent from the opinion of the court in these cases. Tweed, the defendant in error, repaired to the Red River region to purchase cotton, under a written engagement with a government agent to purchase and pay for the same, and to deliver one-fourth part to the government, upon the express consideration stated in the agreement, that it was well known that a great deal of cotton belonging to the Confederate government was in that district, but could not be identified, and was kept back by the parties having it in possession for fear of its being seized. Tweed was to have the prestige of government protection; was to purchase any cotton he could find for sale, without any questions; was to send it to the government agent at New Orleans, and there three-fourths of it were to be set apart to his use and one-fourth to the use of the government. This was the general purport and effect of the agreement. There cannot be a doubt, from the evidence in the case, that he derived great advantage from his semi-official character. But having made his purchases, he concluded that it would be a better speculation to have all the cotton than only three-fourths of it; and, therefore, he sets up the pretence that he did not act under the agreement, but on his own independent account. The cotton, however, went forward, protected by the general policy of insurance taken out by the government agent, and arrived at New Orleans. The government agent, Flanders,

took possession of it, and gave up to Tweed his three-fourths, according to the agreement. The balance he retained for the government, against Tweed's consent, and was sustained in his action by the Secretary of the Treasury.

Tweed sued out a sequestration (a writ in the nature of the common-law replevin) from the United States Circuit Court of Louisiana, and by virtue of that writ one-fourth part of the cotton held by Flanders, the government agent, for the government, was taken out of his possession, and the court held that this was a lawful exercise of the judicial authority.

Now, on the merits of the case, I cannot concur in the opinion that Tweed could, under the circumstances, repudiate his agreement; but I think he was bound by it and by his acts, and was estopped from asserting an independent purchase of the cotton on his own account; and that the charge of the court should have been to that effect, and that the charge given and the refusal to charge as requested were erroneous.

I also hold that this was a suit against the government itself. Flanders did not hold the cotton on his own account, but on government account; and his acts were sanctioned and adopted by the Treasury Department. He was acting for the government, and his possession was the government's possession. Whether he was acting lawfully or unlawfully was a question which the court could not decide by an adverse proceeding in a suit brought for the recovery of the cotton.

This is a very different case from that of a replevin brought by the owner of goods unlawfully taken by a sheriff upon execution against another person. Goods in the custody of the law, seized for the benefit of a private party, in satisfaction of a judgment or to meet an asserted claim, may be replevied by the true owner; but goods claimed by the government itself, as its own goods, and held by its agents in possession, cannot be reclaimed in this manner. They can only be reclaimed by application to Congress, or, in certain cases, to the Court of Claims.

Nor is the case governed by that class of cases in which a mandamus will lie against a government officer to compel him to perform a ministerial duty. Such a writ is issued, or is supposed to be issued, by the government itself, to compel its officials to do their duty to its citizens.