SWEET, Executrix, Respondent, vs. CHICAGO & NORTH-
WESTERN RAILWAY COMPANY, Appellant.

*May 4—May 21, 1914.*

*Railroads: Negligence in "poling" car: Death of switchman: Con-
tributory negligence: Evidence: Questions for jury: Assump-
tion of risk: Federal Employer's Liability Act: Procedure in
state courts: Damages: Instructions to jury: Harmless errors.*

1. In an action against a railway company for the death of a
   switchman, which occurred in the operation of "poling" a
   freight car, the evidence is *held* sufficient to sustain a finding
   of negligence on the part of the foreman in not directing the
   operation to be performed in the usual and ordinary way by
   stopping the engine as soon as the pole or timber was firmly
   braced between the engine and the car to be moved, so as to
   permit the man holding it to get out of the way, and by omit-
   ting to signal the engineer to stop when the timber was so
   braced.
2. The fact that a subordinate employee did not give directions to
   his foreman as to the manner of performing a switching op-
   eration in which both were engaged, cannot be regarded as
   affirmative proof of contributory negligence.
3. The deceased cannot in this case be held to have been guilty of
   contributory negligence as a matter of law, either because he
   rode upon the engine instead of taking a position upon the
   ground while holding the timber with which the operation was
   to be performed, or because he selected for the purpose a tim-
   ber which was only thirty-four inches in length.
4. Under the federal Employer's Liability Act, an employee does
   not assume the risk of a fellow-servant's negligence.
5. In an action under the federal Employer's Liability Act to re-
   cover for the death of an employee, for the benefit of the
   widow and a dependent child, there was no error in instruct-
   ing the jury that in fixing the amount of the damages they
   should include the value of the "support and protection" such
   widow and child would have received during the time the de-
   ceased would probably have lived,—the word "protection" be-
   ing evidently used in the sense of pecuniary protection from
   want or penury.
6. In fixing the amount of damages for the death of an employee,
   under said act, the jury may take into consideration the ordi-
   nary probabilities in respect to future pecuniary benefits and

support which apply generally in human relations, including reasonable expectation of benefits from gifts or inheritance.

7. Where an act of Congress commits to the state courts the duty of trying cases arising thereunder, such cases may be tried according to the state rules of procedure.

8. Where a railway employee, fifty-two years of age, sober and industrious, who had accumulated only a homestead valued at $2,000, had customarily contributed from $90 to $100 a month to the support of his wife, aged forty-nine, and a dependent daughter aged twenty-two, an award of $4,000 to the widow and $1,000 to the dependent child was less than the real value of the support and maintenance of which they were deprived, so that the jury could not be presumed to have allowed anything on account of prospective gifts or inheritance, even if (because of there being no basis in the testimony to justify it) it was error to instruct them that they might consider prospective benefits of that nature.

APPEAL from a judgment of the circuit court for Sauk county: CHESTER A. FOWLER, Judge. *Affirmed.*

*Edward M. Smart,* for the appellant.

For the respondent there was a brief by *Grotophorst, Evans & Thomas,* and oral argument by *Evan A. Evans.*

TIMLIN, J.   This is an action under the federal Employer's Liability Act of Congress.   James Sweet, an employee of the defendant interstate common carrier, while engaged in switching cars in its yard at Baraboo, Wisconsin, on February 16, 1912, was killed, it is charged, by negligence of defendant.   The plaintiff is his widow and executrix.   The case was submitted to a jury, which found that the foreman of the switching crew and the engineer in charge of the switch engine failed to exercise ordinary care, which failure was the proximate cause of Sweet's death; also that there was no contributory negligence on the part of Sweet, and awarded as compensation to his widow $4,000, and as compensation to his feeble-minded child, over twenty-one years of age but a member of his family and dependent upon him for support, the sum of $1,000.   The appellant complains there was no

evidence of any negligence on the part of the defendant, that there was affirmative and undisputed evidence of contributory negligence, and that the trial court erred in instructing the jury on the measure of damages.

Omitting for brevity's sake introductory and explanatory matters, we may begin with the statement that the switching crew present at the time in question consisted of the foreman, Moran, the engineer, Pitts, the fireman, Gayman, and the subordinate switchman, James Sweet. In carrying on their switching operations it became necessary or convenient to push by hand northerly onto the lead track a certain empty refrigerator car standing on a somewhat parallel track connected by switch with this lead track, upon which stood the switch engine and tender, back toward the switch and a short distance south of the switch. Pushing by hand, they got the refrigerator car so that the front part of it was on the lead track and the rear trucks on the frog of the switch, where it stuck and they could move it no further by hand. The foreman, Moran, then directed that they pole the refrigerator car. Poling is an operation sometimes used in switching by which the switch engine is employed to push a car for a short distance, which car is standing upon another somewhat parallel and connecting track. A pole or piece of timber is held with one end against the car to be pushed and the other end pointing toward the engine, which, upon signal, creeps slowly up and presses against the end of this pole or timber, then stops, holding the timber in place. Or the pole or timber may be held with one end against the front or rear of the engine, as the case may be, and the other end pointing in the direction of the car to be pushed, while the engine creeps slowly up until the pole or timber engages the car to be pushed. So far there is no substantial conflict in the evidence, and there is no doubt that the man holding the pole or timber is in a very dangerous position. There was evidence on the part of the plaintiff tending to show that the usual and customary way of

poling was to stop the engine on signal as soon as the pole or timber had been firmly braced between the engine and the car to be moved, in order to permit the man holding the pole to then step aside, after which the engine was started up smartly, giving the car to be moved a sudden push, thus starting it forward, when, of course, the pole or timber dropped to the ground. On the part of the defendant there was evidence tending to show that the usual and customary mode, when the man holding the stick held it against the engine, did not include a stop after the pole was braced, but was to keep on in steady motion toward the car to be moved—push it along, the assistant to continue holding the pole or timber in place. It will be observed that this is still more dangerous than the mode first described. There was evidence upon which the jury might decide that the mode first described was the usual and customary mode of performing this poling operation, and we will consider that point settled by the verdict in plaintiff's favor and proceed to detail what happened in the instant case. It is one of the known operations of switching. Webster, Internat. Dict. "Poling."

It is well known that switch engines stop and start only upon signal from the foreman of the switching crew. When the foreman suggested poling this car, Sweet went to get a pole or stick and Moran signaled the engineer and had him back the engine up so that the tender was from four to six feet behind the south end of the refrigerator car but on the lead track. Sweet came back with a piece of oak plank or timber thirty-four inches long and about four by eight inches, weighing about twenty-eight pounds, and stepped on the rear step of the tender on the fireman's side, holding one end of this timber against the rear of the tender and the other end pointing in the direction of the nearest part of the near end of the refrigerator car. He then said, "All right." Moran was then standing on the engineer's side of the track opposite the opening between the engine and the refrigerator car and

facing Sweet, and the latter was in the position heretofore stated, facing Moran. Moran gave a slow back-up signal to the engineer, who was leaning out of his cab looking back, and the engine moved back slowly until the pole or timber held by Sweet engaged the near end of the refrigerator car. Moran then gave no stop signal, and the engine did not stop but pushed the car about the length of the stick, when suddenly the pole or timber slipped or dropped and the engine crushed Sweet between the tender and the rear of the refrigerator car. When Moran saw that the pole or timber had slipped and the engine and car were coming together he gave a sudden stop signal. The engine stopped promptly, but the car moved on three or four feet from the impetus it had already received. Sweet stepped out on Moran's side, fell down, stated he was "done," and died. The refrigerator car moved altogether from eight to ten feet.

We think it is apparent from the foregoing that there is ample evidence to warrant the jury in finding that Moran was negligent in not directing this poling operation to be performed in the usual and ordinary way and in omitting to signal the engineer to stop as soon as the pole or stick engaged the end of the refrigerator car so as to be firmly braced between that and the tender and the necessity of holding it avoided, and so enable Sweet to leave the step of the tender while the engine gave the necessary push on the stick against the refrigerator car. Whether there is also evidence sufficient to establish the negligence of the engineer is immaterial. Indeed, upon the theory of the defendant and its explanation of the usual and customary mode of performing this poling operation we would be inclined to agree with the learned circuit judge that this usual mode or practice is in itself very negligent. The engineer, Pitts, testified that he did not know much about the poling operation and that he could not say positively whether he remembered poling a car before,

and that he did not know they were going to pole the car in question because nobody told him so, and further:

"In performing a poling operation it is usual for the engineer, when the man is in between holding the stick, to watch the rear end of the car that is being poled, and I certainly did in this case, to see how close I was going to the car, to see when the car was moving. I was not going to couple onto it, but I was going to shove it out over that switch. I don't know exactly how they were doing it. I was working according to signals. The man that was giving me the signals was standing out south of the lead track, and I was watching the end of the box car part of the time, and most of the time I was looking at the man that was giving me the signals. We were moving very slow."

It is argued that in the exercise of ordinary care Sweet. should have taken this stick, placed one end of it against the car, and stood on the ground holding it, and have the foreman direct the engine slowly back to the stick until it set. Then Sweet could have stepped to one side. We cannot think it. affirmative proof of contributory negligence on the part of the injured employee that he did not direct the foreman to direct the backing of the engine slowly to the stick until it set. It. is not usual for the subordinate to give directions to his superior. Equally unsatisfactory is the argument that, because he did not select the more dangerous position of standing on. the ground between the approaching engine and the car to be moved, he was negligent. It is argued that he should have selected a longer pole or stick, but it does not appear that any other was available, and by creeping up slowly until the thirty-four inch oak timber was firmly braced between the engine and the car and then stopping the engine and permitting Sweet to step aside, would have made this firm, solid piece of oak quite appropriate for the purpose for which it was selected. The evidence on this point was left so that the jury could properly find that Sweet expected that this poling should.

be done in the usual and ordinary way as first above described. It must be quite apparent to persons of ordinary and intelligent observation that a stick of this kind, not fastened at either end, could not be used for any purpose of pushing steadily, but is available only for a single push or thrust. It is apparent that as soon as the car was by the first impact released from whatever obstacle stopped or held it, or as soon as it encountered a slight down grade on the rail or passed over any obstacle which retarded its movement, the distance between the engine and the car so pushed would be increased, and an increase of half an inch or less in that distance would cause the stick to drop down and the engine and car collide, unless the engine were immediately stopped or the car should assume such rate of movement that the pursuing engine would not overtake it.

We conclude there was evidence of negligence on the part of the foreman, Moran, sufficient to support the verdict in failing to give a stop signal. Diligence must be commensurate with the danger of the situation. The question of assumption of risk was not requested to be submitted to the jury, and under our statute, sec. 2858m, it is therefore found by the judgment in favor of the plaintiff. The plaintiff did not assume the risk of negligent action of a fellow-servant. To hold the contrary would be to annul sec. 1 of the act of Congress in question. *Northern Pac. R. Co. v. Maerkl,* 198 Fed. 1. The question of plaintiff's contributory negligence was fairly for the jury.

Error is assigned because the jury was instructed as follows:

"In fixing these sums you will be reasonable and just and fix such sums as will in your honest and deliberate judgment recompense or compensate the wife and children for such pecuniary or money loss as they actually sustained in consequence of the death of the husband and father. It is merely a matter of pecuniary loss, however. You cannot allow anything whatever for the grief or anguish of the wife or chil-

dren by reason of the death. You will consider the age of the deceased and that of his wife and children, and the condition of the health of the deceased, his earning capacity, and his reasonable prospects at the time of his death. You should include the value of the support and protection by the deceased of the wife and dependent child or children, if any, that they would have received during the time that he probably would have lived. You should also consider the accumulation of property that the earnings of the deceased would probably have made had he continued to live, if you find that, and the reasonable expectation that the wife and children had of pecuniary advantage by ultimately receiving such accumulations, if such you find. The limit of the total compensation to both wife and children is such sum as, being put at interest, will each year, by taking a part of the principal and adding it to the interest, yield an amount sufficient for such support of the wife and the dependent child or children during the time the deceased would probably have lived as he would have furnished had he lived, together with such other sum as the evidence shows there is a reasonable expectation the wife and children would have received from his earnings. . . . By request of Mr. Thomas I will say that they make no claim for compensation for any child except the youngest, I have forgotten the age, but the one whom it is claimed is in part incompetent.

"Mr. Smart: Then I understand that that part of the judge's instructions relating to that is to be eliminated—it is modified to that extent.

"Court: Yes, wherever I have used the word 'child' or 'children' it will be understood as referring only to this child just mentioned.

"Mr. Thomas: We claim damages for the widow and that child."

It is argued that the use of the word "protection" in this connection was erroneous. The seventh question of the special verdict merely required the jury to find what sum would compensate the widow for the pecuniary loss sustained as a result of Sweet's death; and the eighth question was couched in similar language and referred to the children, which was explained in the charge as referring only to the feeble-minded,

dependent child. Taking the charge as a whole, it is apparent that the court meant in using the word "protection," and must have been understood to mean, pecuniary protection from want or penury. The word was used in this sense in *Ryan v. Oshkosh G. L. Co.* 138 Wis. 466, 120 N. W. 264.

Quoting from *Baltimore & P. R. Co. v. Mackey,* 157 U. S. 72, 86, 15 Sup. Ct. 491:

"In *Rogers v. The Marshal,* 1 Wall. 644, 654, Mr. Justice Davis, speaking for the court, well observed that 'a nice criticism of words will not be indulged when the meaning of the instruction is plain and obvious, and cannot mislead the jury.' And in *Evanston v. Gunn,* 99 U. S. 666, 668, Mr. Justice Strong said: 'Sentences may, it is true, be extracted from the charge which, if read apart from their connection, need qualification. But the qualifications are given in the context, and the jury could not possibly have been misled.' And so in *Tweed's Case,* 16 Wall. 504, 516: 'Courts are not inclined to grant a new trial merely on account of ambiguity in the charge of the court to the jury, where it appears that the complaining party made no effort at the trial to have the point explained.' See, also, *The Sybil,* 4 Wheat. 98."

There was evidence that the deceased was aged about fifty-two at his death. His widow was about forty-nine. They had four children. The youngest, living with her parents, was twenty-two years of age, was feeble-minded, unable to earn her own living, and must be provided for and supported during her life. Deceased owned a homestead worth about $2,000 which he had accumulated since his marriage. He was sober, industrious, and in good health, earned about $100 per month, and turned his pay check over to his wife every month. He had not saved anything except this homestead and monthly premiums on a life insurance policy for $2,000. His expectancy of life according to American Experience Tables of Mortality was 19.49 years, and that of his wife and dependent child greater. It is not quite clear whether the reasonable expectation of pecuniary advantage by ultimately receiving such accumulations mentioned in the instruction re-

lates to expectation of gifts or the expectation of an inheritance by operation of law, or both. The accumulation of property made by the deceased up to the time of his death was small and his earning capacity was not apt to increase. What he had saved, however, was saved during the time when he had a family of four children to maintain, three of whom had become self-supporting. There is evidence of industry, sobriety, and good habits, but no particular indications of thrift or of a saving disposition. In the fact that he turned his pay check over to his wife every month there is ground for an expectancy of a continuation of such gifts. Part of this instruction is taken almost literally from the last sentence in the opinion in *Rudiger v. C., St. P., M. & O. R. Co.* 101 Wis. 292, 77 N. W. 169, and the rule for this state may also be found stated in *Castello v. Landwehr,* 28 Wis. 522; *Kaspari v. Marsh,* 74 Wis. 562, 43 N. W. 368; *Lawson v. C., St. P., M. & O. R. Co.* 64 Wis. 447, 24 N. W. 618; and other cases.

The federal Employer's Liability Act gives a right of action to the personal representative of the persons there described for death caused in whole or in part by the negligence of other agents or servants of employers of the class there mentioned. This is declared to be for the benefit of the surviving widow or husband and children of such injured employee, and if none, then for the benefit of such employee's parents, and if neither widow, husband, children, or parents, then for the benefit of the next of kin dependent upon such employee. Unlike our statute, sec. 4256, this contains no directions as to the measure of damages. Neither did the prototype of all those statutes known as Lord Campbell's Act. Speaking of the Illinois statute similar to ours in *Richmond & D. R. Co. v. Elliott,* 149 U. S. 266, 13 Sup. Ct. 837, the supreme court said:

"Of course, there are possibilities and probabilities before every person, particularly a young man, and a jury in estimating the damages sustained will doubtless always give

weight to those general probabilities, as well as to those spring-ing from any peculiar capacities or faculties."

This, we take it, means that ordinary probabilities which affect every person may be considered by the jury. In *Vicksburg & M. R. Co. v. Putnam*, 118 U. S. 545, 7 Sup. Ct. 1, a judgment was reversed because the trial court by in-structions attempted to fix, by the aid of standard life and annuity tables, the exact measure of the loss of future in-come by the beneficiary.    In *Railroad Co. v. Barron*, 5 Wall. (72 U. S.) 90, the trial court instructed the jury as follows:

"In this case the next of kin are the parties who were in-terested in the life of the deceased.    They were interested in the further accumulations which he might have added to his estate, and which might hereafter descend to them."

The supreme court said:

"The statute in respect to this measure of damages seems to have been enacted upon the idea that, as a general fact, the personal assets of the deceased would take the direction given them by the law. . . . If the person injured had survived and recovered, he would have added so much to his personal estate, which the law, on his death, if intestate, would have passed to his wife and next of kin; in case of his death by the injury, the equivalent is given by a suit in the name of his representative.    There is difficulty in either case [by the in-jured party in case he survives, or by his administrator in case of death] in getting at the pecuniary loss with precision or accuracy, more difficulty in the latter than in the former, but differing only in degree, and in both cases the result must be left to turn mainly upon the sound sense and deliberate judgment of the jury."

Tiffany on Death by Wrongful Act (2d ed.) sec. 159 *et seq.*, distinguishes at least by classification between loss of prospective gifts and that of a prospective inheritance.    The weight of authority seems to be that from evidence of age, health, family relations, amount of earnings, thrift and in-dustry, prior accumulations, and disposition toward the bene-ficiaries, the requisite probability of reasonable expectation

of benefits from gifts or inheritance may be supported. The evidence here is slight on this subject, still there is some evidence to which the instruction may relate. However we have in this state a statute of procedure which forbids the reversal of judgments by this court on the ground of misdirection of the jury or the improper admission of evidence, unless in the opinion of the court, after an examination of the entire action or proceeding, it shall appear that the error complained of affected the substantial rights of the party seeking to reverse or set aside the judgment or to secure a new trial. Sec. 3072m, Stats. 1913. Where an act of Congress commits to the state court the duty of trying cases arising thereunder, such cases may be tried according to the state rules of procedure. Considering the chance of life of the deceased and that of his widow and dependent child and the amount contributed for support, we think it is apparent that the jury allowed nothing for probable gifts or inheritance. If the deceased was contributing from $90 to $100 a month to the support of his family, including the dependent child, it is manifest that $5,000 would not continue this rate of contribution for anything like the period of his expectancy of life. The award of $4,000 to the widow and $1,000 to the dependent child is so small as to be less than the real value of their support and maintenance. It is scarcely equal to the value of such support and maintenance for five or six years at the rate at which the deceased had been accustomed to contribute thereto. So much they lost by his death, allowing him only five years instead of nineteen years expectancy of life. Therefore, while concluding there is some slight basis in the testimony to justify the instructions above quoted, we must at the same time hold that if there is no such sufficient basis in the testimony, nevertheless the quoted instructions did not in this case, as it appears to us, affect the substantial rights of the defendant.

*By the Court.*—Judgment affirmed.